## LEONARDI et ux. v. CHASE NAT. BANK OF CITY OF NEW YORK.

No. 6301.

District Court, E. D. New York.

May 29, 1935.

Frank & Julius Zizmor, of Brooklyn, N. Y., for plaintiffs.

Mudge, Stern, Williams & Tucker, of New York City (George L. Trumbull and Randolph H. Guthrie, both of New York City, of counsel), for defendant.

BYERS, District Judge.

This action at law was tried to the court, a jury having been waived. The plaintiffs, residents of Florida, were the payees named in a check for $3,750.00 dated June 3, 1930, drawn upon the Bank of Manhattan Trust Co., by F. G. H. Realty Co., Inc., which was deposited by the payees in their banking account in the Bank of Bay Biscayne, Miami, Florida, on June 6, 1930. The check was endorsed "For deposit of Florence Leonardi & John Leonardi" and "Pay to the order of any bank or trust company. Previous endorsement guaranteed. June 6, 1930. Bank of Biscayne, Miami, Florida, J. E. Lind, Cashier."

When the deposit was made, the plaintiffs requested that the check be immediately credited, but two officers of the bank refused the request. The plaintiffs were informed that it would be accepted for collection, but could not be drawn against for eight days, or until June 14, 1930.

Also the plaintiffs were informed that, because of their past record, the bank would permit them to draw $750.00 to meet pressing bills "but not to draw against the check."

That evidence was not contradicted, and must be deemed to establish that the bank was willing to permit a temporary over-draft in the plaintiffs' bank account, during the said period of eight-days.

The evidence, also uncontradicted, is that the bank did not pay the $750.00 "on account of this check." Whether it did so otherwise does not appear.

The contract between the bank and the plaintiffs, in respect of this item so taken for collection, is evidenced by the deposit slip reading as follows:

"Bank of Bay Biscayne
"Deposit to Account of
"John and Florence Leonardi
"Miami, Fla., June 6, 1930.
"Please List Each Check Separately

"In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. This Bank or its correspondents may send items, directly or indirectly, to any bank including the payor, and accept its draft or credit as conditional payment in lieu of cash; it may charge back any item at any time before final payment, whether returned or not, also any item drawn on

this Bank not good at close of business on day deposited.

"Dollars Cents

"Receiving
"Currency    " ***
"Silver    "June—6 1930
"Gold    "9
   "Teller
"Checks as follows
"1—2             3750.00
"Release
   "750.00
"O K/ R V B
"Total           $3750.00"

—and by the following notice printed in the pass book:

"Items not payable in this city are taken at your risk until we have reduced to our possession the funds received by us in settlement thereof, and credits, or remittances, made by us, therefore are subject to revocation until we have received final actual payment. The mediums which we employ are your agents, and we assume no responsibility for their neglect; default, or failure. Bank of Bay Biscayne."

On June 6, 1930, the said bank sent by air mail to the defendant, its New York correspondent, this check, with others, listed in an advice reading:

"We enclose cash items for collection and credit. All items listed in this letter to be handled as Cash unless otherwise instructed.

"Items $10.00 and under No Protest. Do not protest items bearing this stamp or similar authority of preceding endorser. Telegraph Non-Payment of Items of $500.-00 and over."

Below this legend appear thirty items, including the $3,750.00 check in question. Under a heading of "Endorser" appear the names which apply to each (in some instances numbers instead of names occur). Opposite this item are the names of these plaintiffs.

The testimony is that the foregoing reached the defendant bank on the morning of June 9, 1930, and that this particular check cleared at 10:00 o'clock, through the New York Clearing House, and that a tentative credit was thereupon entered on defendant's books, which was subject to cancellation up to 3:00 p. m. by reason of action to that end by the drawee bank. No such action was taken and accordingly the credit became definitive at that hour.

On that afternoon, after 3:00 o'clock, notice was mailed to the forwarding bank, by the collecting bank, that the credit had been established. Receipt of that notice is not shown, but the testimony is that in due course it would have reached its destination on June 11, 1930.

At the close of business on June 10, 1930, the forwarding bank was taken over, because of insolvency, by the Comptroller of the State of Florida.

On June 12, 1930, "as of 6/11/30," the defendant applied this credit, and others, to an indebtedness owing by the forwarding bank to it.

There is no testimony on the subject, but the inference is unmistakable, from the documentary evidence, that this was done because knowledge of the forwarding bank's insolvency came to the defendant on June 11th.

The question for decision is whether the plaintiffs have demonstrated a cause of action against the defendant by reason of the collection made by it of the proceeds of the check so deposited with the forwarding bank.

If individuals had been concerned, it would be clear that the subagent for collection would not be justified in retaining the avails of the check, as a means of collecting in part an indebtedness of the primary agent, to the subagent.

The argument is made that, because banks are involved, a different rule of law applies.

The contentions of the defendant are:

That it received from the forwarding bank, not an item for collection (in which event a different form of coverage would have been employed) but a cash item; that is, the forwarding bank advised in effect that it had already given credit to its depositors—the plaintiffs—for this check, which means that the former had acquired the ownership of it, and consequently the collecting bank, having completed the "business of collection" at 3:00 p. m. on June 9, 1930, was "in the position of a debtor, with liberty, like debtors generally, to use the proceeds as its own." The quoted words are from the opinion in Jennings v. United States F. & G. Co., 294 U. S. 216, at page 219 et seq., 55 S. Ct. 394, 79 L. Ed. 869.

If the forwarding bank had been the owner of the check, and its receiver were now seeking to impress a trust upon the defendant's property, that decision would govern. If the contract between the plaintiffs and their bank permitted the latter to change the relation of principal and agent into that of creditor and debtor, at the will of the bank and without notice to the depositors, then the result contended for would probably follow, but such is not thought to be the law.

█ The contract between the Florida bank and the plaintiffs is clearly to the effect that this check was taken at the plaintiffs' risk until the proceeds had been reduced to the bank's possession, i. e., until it had received "final actual payment" —as the pass book states. According to the deposit slip, the bank acted as "depositor's collecting agent." The words which follow—"All items are credited subject to final payment in cash or solvent credits"—are not at variance with the plainly proclaimed agency. They serve to give notice that, if the items are entered as credits to the depositor, such entry is contingent and subject to be "charged back."

These words are consistent only with a disclaimer of the relation of debtor on the part of the bank, to its depositor, for items taken for collection, and as to which the relation of agent is openly proclaimed. That relation was not subject to change into something else, at the agent's will and without notice, for its own purposes or to the benefit of a subagent.

In the language of Dakin v. Bayly, 290 U. S. 143, at page 150, 54 S. Ct. 113, 116, 78 L. Ed. 229, 90 A. L. R. 999: "Could any position taken by the Clearwater bank [the forwarding bank] of its own initiative affect without the depositor's consent the preëxisting relation of principal and subagent between the depositors and the St. Petersburg bank? We think not. Compare Evansville Bank v. German-American Bank, supra [155 U. S. 556, 15 S. Ct. 221, 39 L. Ed. 259]."

It is equally clear in this case that the forwarding bank could not, without the consent of these plaintiffs, hold out to them that it was their collecting agent only, and simultaneously assure the defendant that it was the owner of this check, and thereby invite visitation upon the plaintiffs of the burdens incident to the relation of debtor and creditor as here sought to be imposed, as between the collecting and forwarding banks.

This must be so because, if the plaintiffs had been treated as creditors as to this check, by the forwarding bank, they could have drawn against it at any time between the 6th and 10th days of June, but the evidence shows the contrary.

It is this aspect of the controversy which cannot be overlooked, because other arguments made by the defendant are but variants of the contention that the collecting bank was at liberty to treat the proceeds of this check as the property of the forwarding bank.

█ While it is true that the form of remittance employed by the Florida bank has a definite significance in the recital, it would be possible to attribute too much significance to it.

In the first place, the defendant did not maintain separate accounts, in its ledgers, for collection items as distinguished from credit items, and there is no reason to suppose that this check, had it been remitted in form for collection, would not have been taken over to offset the loan account debit on June 9, 1930. There is no evidence or contention by the defendant to that effect.

Again, the check shows that it was endorsed for deposit, and there is nothing to support an inference that it was customary, to the knowledge of the defendant, for the forwarding bank to credit out-of-town checks to its depositors, prior to collection.

The common-sense of the situation repels any such suggestion, as does banking practice.

For these reasons, it is thought that the form of the Florida bank's remittance is not the controlling element of this controversy.

It is urged that, even though the Florida statute upon which plaintiffs rely be given the effect claimed for it, the defendant performed its full duty because it paid the proceeds to the forwarding bank prior to its closing.

The statute has been pleaded and is in evidence:

Comp. Laws Fla. 1927, "6834. (4748.) *'Due Diligence' by Bank.*—When a check,

draft, note or other negotiable instrument is deposited in a bank for credit, or for collection, it shall be considered due diligence on the part of the bank in the collection of any check, draft, note or other negotiable instrument so deposited, to forward en route the same without delay in the usual commercial way in use according to the regular course of business of banks, and the maker, endorser, guarantor or surety of any check, draft, note or other negotiable instrument, so deposited, shall be liable to the bank until actual final payment is received, and when a bank receives for collection any check, draft, note or other negotiable instrument and forwards the same for collection, as herein provided, it shall only be liable after actual final payment is received by it, except in case of want of due diligence on its part as aforesaid. (Ch. 5951, June 8, 1909, § 1.)"

[4] The defendant relies upon section 350-i of the Negotiable Instruments Law of the state of New York (Consol. Laws N. Y. c. 38), which is as follows:

"§ 350-i. *Medium of Remittance.* Where ordinary care is exercised, any agent collecting bank may receive from any subsequent bank in the chain of collection in remittance for an item which has been paid, in lieu of money, the check or draft of the remitting bank upon any bank other than itself or the drawee or payor of the item or such other method of settlement as may be customary; provided that whenever such agent collecting bank shall request or accept an unconditional credit which has been given to it on the books of the remitting bank or on the books of any other bank, such agent collecting bank shall become debtor for such item and shall be responsible therefor as if the proceeds were actually received by it in money."

The foregoing is not essentially unlike section 9 of the Bank Collection Code (Acts Ind. 1929, c. 164) referred to in the Jennings Case, supra, and what the court there says would apply with equal force to these facts, if the controversy were between the forwarding and the collecting banks, or their legal successors.

The purpose of the statute was to relieve the collecting bank of liability to the depositor of the forwarding bank, for accepting anything but cash in making the collection, but these plaintiffs do not base their cause upon that matter; they do not criticise the method of collection employed by the defendant, but the appropriation of the proceeds to an indebtedness which was foreign to them.

So it seems unnecessary to discuss the contention that the plaintiffs necessarily invoked the law of New York, by entrusting to their own bank the collection of a check which was payable in that state; even if they did, which may be conceded for argument, there is nothing, in a statute sanctioning a particular medium of remittance, which declares that such medium, because of its nature, is rendered the more available to the subagent as an instrument to satisfy its own debts than cash would be; had the collection been made in the latter medium, it would not follow that the collecting bank could use it to pay a debt owing to it by the forwarding bank.

The defendant's contention, that it had discharged its duties in full on the afternoon of June 9, 1930, at 3:00 o'clock, when the tentative credit item of collection was no longer subject to cancellation, and that it was thereafter authorized to appropriate this sum of money to the Florida bank's debt to it, rests in part upon two cases: King v. Bowling Green Trust Co., 145 App. Div. 398, 129 N. Y. S. 977, and Commercial Bank v. Armstrong, 148 U. S. 50, 13 S. Ct. 533, 535, 37 L. Ed. 363.

In the first, the facts are so similar as to render recital unnecessary, with these exceptions:

(A) The check in question was forwarded for collection.

(B) The collecting bank maintained a checking account of the forwarding bank, which was overdrawn on the day that the former made collection of the item remitted to it for collection; the proceeds it applied to the checking account by crediting the amount to its depositor, the forwarding bank, before the insolvency of the latter, which became known on the following day. Under these circumstances, the court held that the relation of agency on the part of the forwarding bank, to its depositor, was changed to that of debtor, by the act of the collecting bank, which has been stated.

Here the evidence is that the collecting bank charged itself on June 9th with the proceeds of the check in question, and credited the forwarding bank, and

sent a notice to that effect, but it was not until two days later, when it must be concluded that notice of insolvency had been received, that it made entries in its books (in evidence) whereby it offset all available credits in favor of the Florida bank, by an equal amount of debits representing loans and advances to a total of $257,458.81.

Thus it is perceived that the theory of the defense comes down to this: That its sub-agency expired when it made the collection on June 9, 1930, and it then became merely a debtor, with all the rights incident to that status, and consequently it could apply the proceeds as stated, two days later, because the latter had lost their identity as funds belonging to the plaintiffs and had become the subject of a mere debt owing by the defendant to its forwarding correspondent.

If this is so, it must be because the primary agent possessed the power so to enable the sub-agent. It is thought that evidence of the contract between the plaintiffs and the Florida bank generally, and specially with reference to this transaction, is to the contrary.

In the second case relied upon, the plaintiff bank in Philadelphia had forwarded commercial paper to Fidelity National Bank in Cincinnati, to collect, under a special contract providing for remittance of collections at stated intervals.

That contract was held to contemplate the use of proceeds between the remittance days, by the collecting bank, as its own funds.

The Fidelity Bank failed, while many of the items were with sub-agents in process of collection. The plaintiff sought to enforce a trust upon the proceeds of the various items, and was successful as to those which could be traced into the hands of the receiver of the Fidelity Bank. The affairs of the latter with reference to the various sub-agents fell into two classes:

(a) Cases in which the Fidelity had been indebted to them, and collections had been made and entered in their books as a credit against the debt. These were considered as reduced to possession and as having passed into the general funds of the Fidelity and not traceable.

(b) Cases in which the Fidelity was not indebted to sub-agents and the collections remained in their hands or had been remitted to the receiver. These were held to be traceable.

The Supreme Court, in affirming the decision below, used this language: "We also agree with the circuit court, in its conclusions as to those moneys collected by subagents to whom the Fidelity was in debt, and which collections had been credited by the subagents upon the debts of the Fidelity to them before its insolvency was disclosed; for there the moneys had practically passed into the hands of the Fidelity. The collection had been fully completed. It was not a mere matter of bookkeeping between the Fidelity and its agents. It was the same as though the money had actually reached the vaults of the Fidelity. It was a completed transaction between it and its subagents, and nothing was left but the settlement between the Fidelity and the principal,— the plaintiff."

Again it will be seen that the crediting by the sub-agents to the general indebtedness of the Fidelity was *before insolvency was disclosed,* not afterwards.

Here the credit to the Florida bank's account was not entered as an exercise of a debtor's privilege to offset, until knowledge of insolvency was received, and, if the defendant chose then to deal with all items as though they were the property of the Florida bank, and without inquiry, it must accept the incidents of that decision, where the rights of third parties are involved.

It is not necessary to consider what the situation would have been, had the defendant done on June 9th what it is shown to have done "as of" two days later, because such facts are not before the court.

The evidence is that there were two accounts maintained by the defendant with the Florida bank. One is shown in Defendant's Exhibit D, a ledger sheet which the assistant cashier said was the original ledger record of the account of "What we call 'The Bank Accounts.'" Under the column headed "Credit" appears, under date of June 9, 1930, an item of $27,147.68, which is the same total as that shown on the remittance form, Defendant's Exhibit C, from the Florida bank, dated June 6, 1930.

After that entry was made, which has been called a tentative credit until 3:00 o'clock in the afternoon of June 9th, a

credit advice was forwarded by mail to the Florida bank, which in due course would have arrived on June 11, 1930.

The credit entry thus far was a record that the defendant had made the collection and was accountable for it.

It was not such a transaction as was shown in either of the two cases referred to, upon which the defendant relies.

On June 12th, "as of 6/11/30," there was a transfer of the said credit, and that is shown by the Defendant's Exhibit I, which is a transcript of "Bank Loan Liability Ledger." The assistant cashier in charge of "making loans and following bank correspondents' accounts" identified it. He said that a balance appearing on the bookkeeper's ledger to the credit of the Florida bank, of $257,458.81, from the deposit account, was applied on the bank loan liability of the Florida bank in reduction of that indebtedness.

There were subsequent negotiations and adjustments between the defendant and the liquidator of the Florida bank, which are recited in an agreement dated November 18, 1930, Defendant's Exhibit H.

The transaction of June 12th, "as of June 11th" is thus referred to therein: "On and since June 11, 1930, The Chase Bank has appropriated and retained certain cash balances and credits of the Bank of Bay Biscayne held by it on deposit and otherwise. * * *"

It was that appropriation of the proceeds of the plaintiffs' check which the defendant seeks to justify, upon the theory that the entry made on June 9th in Defendant's Exhibit D so permitted.

If the alchemy of accountancy is so potent, then the defendant by its own act, without notice to any one, could transmute the plaintiffs' property into that of the forwarding bank. If the decision in Dakin v. Bayly, supra, is understood, the defendant did not possess the power to accomplish that purpose.

The defendant's trial brief asserts that the transactions resulting in the contract of November 18, 1930, to which allusions have been made, constituted a payment to the forwarding bank of the proceeds of the plaintiffs' check, because the balance struck involved that item. This position is not taken in its final brief, in which reliance is placed solely upon the credit entry of June 9th.

If the argument is still current, there should be said, in answer, that the defendant was in the position to inform itself by inquiry as to the precise status of this check, once it became aware of the insolvency of its forwarding bank. It could have learned whether the Florida bank was the owner, or the agent for collection of this item, and could have governed itself accordingly.

The handling of the situation by the defendant is shown to have been consistent with a preference for acting without information, lest the folly of being wise might defeat the promptings of self interest.

The fact that the defendant chose to part with the forwarding bank's property on November 18, 1930, without taking the precaution to guard itself against the claims of those toward whom it bore the relation of sub-agent, is thought not to cancel the legal incidents of that relation.

The defendant's motion to set aside the service of the summons and to dismiss the complaint for lack of jurisdiction because it was not sued in the Southern District was denied at motion term, without equivocation. That decision, it seems, was based upon the National Banking Act (title 12 U. S. C. §§ 36, 81 and 94 [12 USCA §§ 36, 81, 94]) and is followed.

Judgment for the plaintiffs with costs.